IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
Case No. 3:15-cv-181

DITCH WITCH OF CHARLOTTE, INC.,
d/b/a Ditch Witch of the Carolinas,

Plaintiff,

v.

BANDIT INDUSTRIES, INC.,

Defendant.

**ORDER**

This matter is before the Court upon both Plaintiff's and Defendant's Motions for Partial Summary Judgment. Both motions have been fully briefed and are ripe for disposition.

**FACTUAL BACKGROUND**

Plaintiff Ditch Witch of Charlotte, Inc. ("Ditch Witch") is a dealer of heavy equipment with its headquarters in Charlotte, North Carolina and with facilities in both North Carolina and South Carolina. Defendant Bandit Industries, Inc. ("Bandit") manufactures heavy equipment and related parts used primarily in the tree care and forestry industries and landscaping and land clearing operations, including construction related land clearing. Bandit's line of equipment includes hand-fed chippers, whole tree chippers, stump grinders, and Beast Recyclers (also known as "horizontal grinders").

1

Ditch Witch has been a dealer for Bandit in North Carolina and South Carolina since 2004. On July 23, 2007, Bandit and Ditch Witch entered into a new Dealer Agreement in which Ditch Witch was appointed as Bandit's authorized dealer for the retail sale of hand-fed chippers and stump grinders in thirty-five counties in North Carolina and all but two South Carolina counties, and for the retail sale of whole tree chippers and Beast Recyclers in all of South Carolina and sixty-four counties in North Carolina. The Dealer Agreement was amended in 2008 to allow Ditch Witch to be the authorized dealer for Bandit's large equipment line only (whole tree chippers and Beast Recyclers) in Georgia. The Agreement was amended once again in 2009 so as to appoint the Plaintiff as the Defendant's authorized dealer in the entire state of North Carolina for "the complete line of Bandit hand-fed chippers, stump grinders, whole tree chippers and Beast Recyclers." (Doc. No. 59-1, p.20).

The Dealer Agreement stated that its initial term of one year would be automatically renewed for successive terms of one year unless certain notice of non- renewal was given. The Agreement also specified that, with respect to any "statutes or common law regulating or directly affecting the relationship between manufacturers or distributors of machinery, equipment, implements or attachments of the type covered by this Agreement and their dealers," Ditch Witch "shall have the rights and duties provided by like statutes or laws, if any, of the state where [Ditch Witches'] facilities are located." (*Id.* at p. 13). At the time of execution of the Dealer Agreement and at all times subsequent thereto, Ditch Witch has had facilities in North Carolina and South Carolina.

Ditch Witch alleges that it fully and faithfully performed its obligations under the Dealer Agreement and that it was one of Bandit's most successful dealers. Bandit, on the other hand, alleges that the parties' business relationship had become strained due to various disputes,

including Ditch Witch's failure to open facilities in Georgia and Eastern North Carolina, and failure to hire and retain adequate staff.

During the parties' relationship, Ditch Witch designed and sold aftermarket cutter-body assemblies that could be used on Bandit horizontal grinders. Cutter-body assemblies are typically sold to the customer and then installed by the customer. There is no evidence that Ditch Witch ever installed any aftermarket cutter-body assembly on any customer's machine.

In May of 2014, Bandit began to engage in discussions with Yancey Bros. Co. regarding a Bandit dealership in Georgia. Subsequently, in November of 2014, Bandit informed Ditch Witch that it intended to terminate Ditch Witch's dealership in Georgia.

On April 13, 2015, Bandit sent Ditch Witch a letter by certified mail notifying Ditch Witch that it did not intend to renew the Dealer Agreement when the term ended on July 23, 2015. In the letter, Bandit specifically provided a statement of reasons for the non-renewal,[1] including such things as failing to "aggressively promote the sale of Products," failing to maintain an adequate sales staff, failing to open full-service sales facilities in Georgia and Eastern North Carolina, and selling machine parts that infringe Bandit's patents. (Doc. No. 24-2). The letter specifically listed what Ditch Witch must do in order to cure the deficiencies within 60 days. It is undisputed that Ditch Witch did not cure the deficiencies.

After receiving the letter, Ditch Witch filed suit in this court as well as a motion to enjoin Bandit from terminating its relationship with Ditch Witch. After a hearing, the Court denied Ditch Witch's motion.

---

[1] The letter identified three categories of deficiencies, each consisting of three or four subparagraphs with specific examples.

After the Dealer Agreement was terminated, Ditch Witch became a dealer for Trelan. Ditch Witch owns the www.banditofthesoutheast.com URL. At some point, content was linked to the URL which stated, in pertinent part,

> It has been our pleasure to serve you as a Bandit dealer for more than 10 years. Our name and our products have changed, but our service and our dedicated team have not. . . . Authorized Dealer for Trelan Whole Tree Chippers and Micro-Chippers.

The link between this URL and the Trelan content was removed on February 9, 2016, when Bandit raised it as an issue.

Ditch Witch has filed an Amended Complaint alleging claims for breach of contract, unlawful termination under the North Carolina Farm Machinery Act, N.C. Gen. Stat. §§ 66-180 *et. seq.* (the "NC Act"), unlawful termination under the South Carolina Fair Practices of Farm, Construction, Industrial, and Outdoor Power Equipment Manufacturers, Distributors, Wholesalers, and Dealers Act, S.C. Code Ann. §§ 39-6-10 *et. seq.* (the "SC Act"), Unlawful Failure to Pay Warranty Obligations under the NC Act, Unlawful Failure to Comply with Repurchase Obligation under the NC Act, and Unfair and Deceptive Trade Practices under N.C. Gen. Stat. §75-1.1 ("UDTPA"). Bandit has counterclaimed for breach of contract, violation of the UDTPA, and trademark infringement. The parties engaged in discovery and have now filed motions for partial summary judgment. Bandit has moved for partial summary judgment as to Ditch Witch's claim for violation of the NC Act (Claim II), paragraphs 39(a) and (b) of Claim I for breach of contract, and Paragraph 73 of Claim VI for violation of the UDTPA. In addition, Bandit seeks to have the Court find as a matter of law that Ditch Witch's damages under the SC Act are limited to those in connection with South Carolina sales and services only. Ditch Witch moves for partial summary judgment as to Bandit's Second and Third Claims for Relief (Unfair

and Deceptive Trade Practices and Trademark Infringement) and as to paragraphs 60(b), 60(c), and 60(d) of Bandit's First Claim for Relief (breach of contract).

**DISCUSSION**

**A. Summary Judgment Standard**

"A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." Fed. R. Civ. P. 56(a). Rule 56(c) of the Federal Rules of Civil Procedure mandates that "[s]ummary judgment is appropriate where the Court is satisfied that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986) (internal quotation marks omitted). Legal questions in particular are "appropriate for summary judgment based on the pleadings, affidavits of the parties and their legal arguments." *N.C. Const. Party v. Bartlett*, No. 3:12-CV- 00192-GCM, 2012 WL 5185852, at *2 (W.D.N.C. Oct. 18, 2012).

**B. Bandit's Motion for Partial Summary Judgment**

    **1. The North Carolina Farm Machinery Act**

N.C. Gen. Stat. § 66-182 governs the termination of the parties' Agreement with regard to the North Carolina dealership. The statue provides:

> (a) Notwithstanding any agreement to the contrary, a supplier who terminates or otherwise fails to renew or substantially changes the competitive circumstances of an agreement with a dealer *without good cause* shall notify the dealer of the termination not less than 90 days prior to the effective date of the termination and shall provide a 60-day right-to-cure the deficiency. If the deficiency is cured within the allotted time, the notice is void. In the case where cancellation is enacted due to market penetration, a reasonable period of time shall have existed where the supplier has worked with the dealer to gain the desired market share. If there is any reason constituting good cause for action, the notice shall state that reason.
> (a1) Notwithstanding any agreement to the contrary, a supplier who terminates or otherwise fails to renew or substantially changes the competitive circumstances of

> an agreement with a dealer for good cause is not required to notify the dealer of
> the termination or to provide a right-to-cure the deficiency.
> (b) Notwithstanding any agreement to the contrary, a dealer who terminates an
> agreement with a supplier shall notify the supplier of the termination not less than
> 90 days prior to the effective date of the termination.
> . . .
> (c) Notification under this section shall be in writing and shall be by certified mail
> or personally delivered to the recipient. It shall contain all of the following:
> > (1) A statement of intention to terminate the dealership.
> > (2) A statement of the reasons for the termination.
> > (3) The date on which the termination takes effect.

N.C. Gen. Stat. § 66-182 (emphasis added)

Ditch Witch does not argue that the notice letter was untimely or procedurally defective. Rather, Ditch Witch contends that North Carolina law requires the existence of "actual deficiencies" in order to terminate or fail to renew the Agreement. *See* Am. Compl. ¶ 46. Ditch Witch argues that the stated reasons in the notice were merely pretextual and there was therefore no deficiency to be cured.

While the language of the statute is not a picture of clarity, there can be no argument that the statute allows for termination or nonrenewal without good cause. *See Interstate Equip. Co. v. ESCO Corp.*, No. 5:11CV51-RLV, 2014 WL 3547348, at *4 (W.D.N.C. July 17, 2014). However, Ditch Witch seeks to have the Court evaluate the stated reasons for nonrenewal to determine whether or not they are valid reasons. While there are no cases addressing this issue with regard to N.C. Gen. Stat. § 66-182, the court in *Chesapeake Supply & Equipment Company v. J.I. Case Company*, 700 F. Supp. 1415 (E.D. Va. 1988) rejected the same argument with regard to the Maryland Equipment Dealer Contract Act ("Maryland Act"). In *Chesapeake Supply*, the dealer argued the manufacturer's termination notice violated the Maryland Act. Like the NC Act, the Maryland Act required a "statement of the reasons for the termination" be included in the notice of termination. The *Chesapeake Supply* dealer argued that the defendant's

stated reasons were unreasonable, and that "by requiring the supplier to state the reasons for termination, the Act implicitly demands that the proffered reasons meet some standard of reasonableness." *Id*. at 1419. After carefully examining the legislative history and intent of the Maryland Act, the court disagreed, finding that the dealer's reading was inconsistent with the legislature's intent to allow termination without cause. It further noted that "no statutory standard is given by which to measure the acceptability of any reason," and that the plaintiff's argument required the court to "not only imply from the silent statute a requirement that termination be based on a reason, but it must also devise a standard for acceptable reasons." *Id*. This, the court held, was impermissible because it forced the court to "cross[ ] the line from statutory interpretation to drafting." *Id*.

The Court finds the reasoning in *Chesapeake Supply* to be particularly persuasive. Ditch Witch asks the Court to read a reasonableness requirement into termination or nonrenewal under the NC Act and determine whether the reasons Bandit identified in the notice were legitimate reasons or "pre-textual." *See* Am. Compl. ¶¶ 46-47. As in the Maryland Act's legislative history, nothing in the NC Act's legislative history suggests an intent to limit the manufacturer's termination rights. On the contrary, the NC Act was amended in 2003 specifically to allow termination without cause. 2003 N.C. Sess. Laws 2003-195 (H.B. 116). Nor is there any suggestion that the reasons for termination must be reasonable (or, in the words of Ditch Witch not a "pre-text") or meet any other standard. *Cf. Chesapeake Supply*, 700 F. Supp. at 1419-20 ("No mention is made in the various committee reports or analyses of any limitation on the supplier's or dealer's right to terminate the dealership agreement with proper notice. Such silence is not insignificant; a limitation on termination rights is too important a subject to go

7

unremarked."). Since the NC Act allows for nonrenewal without good cause, whether Bandit's reasons for nonrenewal were "pre-textual" is immaterial.

Bandit's NC notice complied to the letter with the NC Act, and Bandit properly declined to renew the Agreement under Section 66-182(a). Therefore, Bandit is entitled to summary judgment as to Ditch Witch's Second Claim for Relief (Unlawful Termination under the NC Act).

Paragraphs 39(a) and (b) of Plaintiff's Amended Complaint allege that Bandit breached the implied covenant of good faith and fair dealing by threatening to terminate the Agreement in an effort to coerce Ditch Witch into a new dealer agreement, and ultimately in terminating that Agreement. Bandit argues that because it properly declined to renew the Agreement under the NC Act, it cannot be said to have breached any implied covenant of good faith and fair dealing. Moreover, Bandit contends that for the same reason its actions in failing to renew cannot be an unfair or deceptive trade practice, as alleged in Paragraph 73 of the Amended Complaint.

"[T]he exercise of contractual rights is not an unfair trade practice under the North Carolina statute." *In re Nantahala Vill., Inc.*, 976 F.2d 876, 882 (4th Cir. 1992); *see also United States Dev. Corp. v. Peoples Fed. Sav. & Loan Ass'n*, 873 F.2d 731, 735 (4th Cir. 1989) ("[A]s a matter of law Peoples' exercise of its contractual right to withdraw could not form the basis of a deceptive trade practice claim under Chapter 75, N.C. Gen. Stat."); *Tar Heel Indus., Inc. v. E.I. duPont de Nemours & Co.*, 370 S.E.2d 449, 452 (N.C. Ct. App. 1988) ("[I]t was not unfair or deceptive for DuPont to study and seek alternative methods of transportation; nor was it unfair or deceptive to exercise the contract's termination clause."). Accordingly, Bandit is entitled to judgment as a matter of law on Paragraph 73 of the Amended Complaint.

Likewise, the Court finds that Bandit's exercise of its right to terminate under the Agreement cannot form the basis of a claim for breach of an implied covenant of good faith and fair dealing. Thus, Bandit is also entitled to summary judgment on Paragraphs 39(a) and (39)(b) of the Amended Complaint.

### 2. The SC Act

Bandit seeks a ruling from the Court that limits Ditch Witch's damages under its Third Claim for Relief (unlawful termination under the SC Act) to those occurring from sales or service within the State of South Carolina only. Ditch Witch argues that it is entitled to recover all damages sustained by reason of Defendant's alleged violation of the SC Act, regardless of where the damages were sustained. Ditch Witch contends that because Bandit chose to enter into one Dealer Agreement covering multiple states, and that Agreement expressly provides that Ditch Witch "shall have the rights" of both South Carolina and North Carolina law with respect to any laws "regulating or directly affecting" their relationship, Bandit subjected the entire agreement to the protections of South Carolina law.

Both Fourth Circuit and South Carolina make it clear that that "South Carolina statutes 'have no extraterritorial effect.'" *Carolina Trucks & Equip., Inc. v. Volvo Trucks of N. Am., Inc.*, 492 F.3d 484, 489 (4th Cir. 2007) (quoting *Ex Parte First Pa. Banking & Trust Co.*, 148 S.E.2d 373, 374 (S.C. 1966)). In *Carolina Trucks*, the Fourth Circuit held that the South Carolina Automobile Fair Practices Act could not regulate automobile sales outside the state. *See id.* at 490. The court relied on the rules of statutory construction set forth by the South Carolina Supreme Court, and found they plainly prohibited extraterritorial application.

> In construing a state law, we look to the rules of construction applied by the enacting state's highest court. *See Liberty Mut. Ins. Co. v. Triangle Ind., Inc.*, 957 F. 2d 1153, 1156 (4th Cir. 1992). South Carolina rules of construction provide that statutes must not be read to operate outside the state's borders. The South

9

Carolina Supreme Court has written repeatedly that South Carolina statutes "have no extraterritorial effect" [citations omitted], because "the general rule is that no state or nation can, by its laws, directly affect, bind, or operate upon property or persons beyond its territorial jurisdiction." (citations omitted).

*Id.* at 489.

Following this reasoning, the District of South Carolina recently applied *Carolina Trucks* to the SC Act. *See Machinery Sols., Inc. v. Doosan Corp.*, No. 3:15-cv-03447-JMC, 2015 WL 5554357 (D.S.C. Sept. 18, 2015). In *Doosan*, a manufacturer of construction equipment terminated its agreement with its dealer for North Carolina, South Carolina, and Georgia. *See id*. at *1-2. The dealer sued the manufacturer, seeking to enjoin it from, *inter alia*, terminating its relationship with the dealer, refusing the dealer's orders, establishing a new dealer in North Carolina, South Carolina, and Georgia, and enjoining the new dealer from selling or servicing equipment in the three states. *Id.* at *3. The court denied the motion for a preliminary injunction, holding that the SC Act cannot be applied extraterritorially to (1) enjoin the manufacturer from establishing new dealers in North Carolina or Georgia, or (2) "restrict[ ] sales activity in South Carolina if the transactions take place in North Carolina or Georgia." *Id*. at *3-4. Further, the court held that since the new dealer was based in North Carolina and planned to sell equipment to customers in all three states from that location, the injunction also should be denied as to the new dealer's South Carolina sales. *Id.* at *4. The court noted that *Carolina Trucks* was directly on point. *Id*.

*Doosan* is remarkably similar to the present case. Both involve manufacturers of large machinery in disputes with their dealers in the same tri-state area. Most importantly, in both cases the plaintiff wrongly seeks to apply the SC Act beyond South Carolina's borders by enforcing the SC Act's restrictions on termination outside that state's borders. It is true that Ditch Witch, while headquartered in Charlotte, also has three branch facilities in South Carolina. *See*

Am. Compl. ¶¶ 9, 44, 55. This does not mean, however, that the SC Act applies to the other states covered by the Agreement. Instead, the SC Act can apply, at most, to Ditch Witch's business activity within South Carolina. *See Carolina Trucks*, 492 F.3d at 492; *Doosan*, 2015 WL 5554357, at *4.

This principle was well explained by the Seventh Circuit in a case alleging wrongful dealer termination under the Wisconsin Fair Dealership Act ("Wisconsin Act"). *See Morley-Murphy Co. v. Zenith Elecs. Corp.*, 142 F.3d 373, 379 (7th Cir. 1998). There, the plaintiff asked for lost profits in connection with terminated dealerships in Wisconsin, Iowa, and Minnesota. However, the Seventh Circuit held application of the Wisconsin Act to dealerships outside Wisconsin would "raise significant questions under the Commerce Clause." *See id*. As the court noted, varying dealer termination laws in other states conflict with the Wisconsin Act, effectively allowing Wisconsin to impose its public policy outside its borders. *See id*.

An example the Seventh Circuit provided is particularly apposite for this case. The court posed a hypothetical wherein the Iowa legislature passed a dealer statute allowing for termination without good cause (as opposed to the Wisconsin Act's provision mandating good cause for termination). *See id*. The court reasoned that a manufacturer working with a dealer serving both the Wisconsin and Iowa markets under a single dealer agreement would be unable to get out of the Iowa market if, for example, it simply wanted to cease doing business there, because the Wisconsin Act does not allow termination without good cause. *See id*. According to the Seventh Circuit, under this scenario, "any state that has chosen a policy more *laissez faire* than Wisconsin's would have its choices stymied, because the state that has chosen more regulation could always trump its deregulated neighbor." *Id.*

The differences between the NC Act and SC Act present the same scenario. The SC Act prohibits nonrenewal without "due cause" while the NC Act expressly permits nonrenewal without "good cause." *Compare* S.C. Code Ann. § 39-6-130 with N.C. Gen. Stat. § 66-182(a). Enforcing the SC Act against Bandit for business outside of South Carolina allows the South Carolina Legislature to stymie the North Carolina General Assembly's policy to allow for nonrenewal without good cause. Moreover, South Carolina's definition of what constitutes "due cause" differs from North Carolina's definition of "good cause." The regulatory schemes are starkly at odds, and enforcing the stricter SC Act outside of South Carolina would allow the South Carolina Legislature to trump North Carolina's more *laissez faire* policy. *See Morley-Murphy*, 142 F.3d at 379.

In support of its argument that a choice of law clause in a dealer agreement may allow a state's dealer law to operate outside its borders, Ditch Witch relies on an interpretation of Wisconsin's dealer statute ("WFDL") in *C.A. May Marine Supply Co. v. Brunswick Corp.*, 557 F.2d 1163 (5th Cir. 1977) and *Boatland, Inc. v. Brunswick Corp.*, 558 F.2d 818 (6th Cir. 1977). However, both cases have been expressly disavowed by the Wisconsin Supreme Court, the Fourth Circuit, the Sixth Circuit, and the Seventh Circuit because almost immediately after those cases came down, Wisconsin amended the WFDL to apply only to dealers "situated in this state." *See Baldewein Co. v. Tri-Clover, Inc.*, 606 N.W.2d 145, 149 (Wis.) ("[I]t is abundantly clear that a Wisconsin choice-of-law provision will not operate to trigger the application of the WFDL. Indeed, choice-of-law provisions in dealership agreements have nothing to do with the 'situated in this state' analysis at all."), *op. after certified question answered*, 221 F.3d 1338 (7th Cir. 2000); *see also Peugeot Motors of Am., Inc. v. Eastern Auto Distribs., Inc.*, 892 F.2d 355, 362 n.8 (4th Cir. 1989) (noting that *May Marine* and *Boatland* "are not persuasive" for the same

reason); *Bimel-Walroth Co. v. Raytheon Co.*, 796 F.2d 840, 842-43 (6th Cir. 1986) (distinguishing *Boatland*).

Ditch Witch also contends that the SC Act itself contains no geographic limitation on its application, and thus it may apply outside of South Carolina. Contrary to Plaintiff's contention, the SC Act does contain express geographic limitations, as it provides: "A person who engages directly or indirectly in purposeful contacts *within this State* in connection with the offering or advertising of equipment for sale or has business dealings *with respect to equipment within this State* is subject to the provisions of this chapter and to the jurisdiction of the courts of this State upon service of process in accordance with the provisions of Chapter 9, Title 15." S.C. Code Ann. § 39-6-30 (emphasis added).

Ditch Witch's position is at odds with established Fourth Circuit and South Carolina law. The Court therefore holds that Ditch Witch cannot recover damages under the SC Act in connection with sales and service originating outside the state of South Carolina.

**C. Ditch Witch's Motion for Partial Summary Judgment**

Ditch Witch has moved for partial summary judgment as to Bandit's Second and Third Claims for Relief (Unfair and Deceptive Trade Practices and Trademark Infringement) and as to paragraphs 60(b), 60(c), and 60(d) of Bandit's First Claim for Relief (breach of contract).

**1. Trademark Infringement**

In its Third Claim for Relief, Bandit contends that Ditch Witch infringed Bandit's "Bandit" and "The Beast" trademarks by using the domain name http://www.banditofthesotheast.com "in connection with the marketing and sale" of competitive products. To establish its trademark infringement claim, the Defendant must prove, in part, that Ditch Witch's use of the Bandit mark in the URL was likely to confuse consumers. *Rosetta*

*Stone Ltd. v. Google,* 676 F.3d 144, 152 (4th Cir. 2012). "[T]he use of a competitor's mark that does not cause confusion as to source is permissible." *Lamparello v. Falwell*, 420 F.3d 309, 314 (4th Cir. 2005). Summary judgment is appropriate "if, based on the undisputed facts in the summary judgment record, no reasonable jury could find a likelihood of confusion." *Renaissance Greeting Cards, Inc. v. Dollar Tree Stores, Inc. (Renaissance I )*, 405 F.Supp.2d 680, 690 (E.D.Va. 2005), *aff'd*, 227 Fed.Appx. 239 (4th Cir. 2007).

Bandit would have the Court adopt the "initial interest confusion" doctrine, a "relatively new and sporadically applied doctrine" that "'forbids a competitor from luring potential customers away from a producer by initially passing off its goods as those of the producer's, even if confusion as to the source of the goods is dispelled by the time any sales are consummated.'" *Lamparello*, 420 F.3d at 315-16 (quoting *Dorr-Oliver, Inc. v. Fluid-Quip, Inc.*, 94 F.3d 376, 380 (7th Cir. 1996)). However, the Fourth Circuit has "never adopted the initial interest confusion theory; rather [it has] followed a very different mode of analysis, requiring courts to determine whether a likelihood of confusion exists by 'examin[ing] the allegedly infringing use *in the context in which it is seen by the ordinary consumer*.'" *Id.* at 316 (emphasis in original). The Fourth Circuit has explained that "[w]hen dealing with domain names, this means that a court must evaluate an allegedly infringing domain name in conjunction with the content of the website identified by the domain name." *Id.*

Ditch Witch argues that the evidence is insufficient to support a claim of trademark infringement with regard to its use of the domain name because there can be no likelihood of confusion as to the origin of the products offered based upon the contents of the website. Here, no reasonable jury could find, from an examination of the contents of the website, that the use of the "Bandit" mark in the URL would likely confuse consumers as to the origin of the products

being offered. From the content, it is clear that this is a website for Trelan products, a competitor to Bandit. The website expressly states that the Plaintiff is no longer a Bandit dealer, that its "name" and "products have changed," and that it is now the authorized dealer for Trelan. Although the website advertised the sale of some used products (including some used Bandit products), the unmistakable conclusion from review of the contents of the website is that the Plaintiff is a Trelan dealer and no longer affiliated with Bandit. Accordingly, Bandit's trademark infringement claim with regard to the domain name must fail as a matter of law.

Bandit also alleges that Ditch Witch infringed on its trademark by representing to customers that its aftermarket cutter-bodies were genuine Bandit parts, thereby causing a likelihood of confusion among customers over whether they were buying Bandit's or Ditch Witch's cutter-bodies. The problem with Bandit's allegation is that it has no evidence whatsoever that Ditch Witch made this representation to any customer. The only evidence Bandit puts forth in support of its claim is the deposition testimony of Garen Nelson, principal of Nelco Recycling and Aggregate Company ("Nelco"). Nelco purchased aftermarket cutter-bodies from Ditch Witch that allegedly broke apart and damaged Nelco's Bandit machine. Nelson testified in his deposition that he did not ask Ditch Witch if the aftermarket cutter-bodies were Bandit cutter-bodies but that he merely "assumed" that they were. There is no evidence that Ditch Witch ever represented to him that the cutter-bodies he purchased were genuine Bandit cutter-bodies. A trademark infringement claim cannot be based on an "assumption." There can be no trademark infringement unless Ditch Witch actually used Bandit's mark to identify the source or affiliation of the cutter-bodies being sold.

## 2. Breach of Contract

As one of the bases for its breach of contract claim, Bandit alleges that Ditch Witch breached Section 9.B of the Dealer Agreement, which provides:

> Dealer shall not offer for sale or use in the repair or servicing of Products, as a genuine Bandit replacement part, any part that in fact is not a genuine new Bandit part or use in the repair or servicing of Products any part that is not equivalent in quality and design to genuine new parts supplied or approved by BANDIT.

As discussed above, Bandit fails to produce any evidence that Ditch Witch represented to any customer that the aftermarket cutter-bodies designed by Ditch Witch were genuine Bandit replacement parts. Therefore, to the extent Bandit's breach of contract claim is based upon the mere sale by Ditch Witch of its own cutter-bodies, the claim must fail.[2]

Bandit also alleges that Ditch Witch breached the Agreement in that it "use[d] in the repair or servicing of Products any part that is not equivalent in quality and design to genuine new parts supplied or approved by Bandit." Bandit contends that the Ditch Witch cutter-bodies were substandard and actually damaged Nelco's Bandit machine. Ditch Witch contends that it sold the cutter-bodies but never actually installed them. Rather, the customers would purchase the cutter-bodies and install them on their own machines. Bandit has no evidence that Ditch Witch actually repaired or serviced a Bandit machine using Ditch Witch's cutter-bodies or did anything other than merely selling the aftermarket cutter-bodies. Therefore, Ditch Witch contends, there is no evidence that it used aftermarket cutter-bodies in the "repair or servicing" of Bandit products. The Court agrees. The mere act of selling a part does not constitute use by Ditch Witch of the part in the "repair or servicing" of a Bandit machine. Therefore, there is no

---

[2] Bandit makes much ado about the fact that Ditch Witch designed and manufactured its own cutter-bodies and sold them to customers. However, Bandit could have expressly prohibited such a practice in the Dealer Agreement had it desired to do so.

genuine issue of material fact that Ditch Witch's actions do not constitute a breach of Section 9.B of the Dealer Agreement, and Ditch Witch is entitled to summary judgment in its favor as to Bandit's allegations in paragraphs 60(b) and 60(c) of its First Claim for Relief.

In paragraph 60(d) of Bandit's First Claim for Relief, it alleges that:

> Ditch Witch failed to promptly and efficiently render warranty service to customers whose products have been damaged by the Substandard Parts and failed to indemnify Bandit against liabilities that have arisen by Ditch Witch's failure to render such warranty service in breach of Paragraph 8 of the Dealer Agreement and the Warranty Policy and Procedures Manual, Bulletins, and Instructions.

(Doc. No. 46, ¶ 60(d)). Under Paragraph 8.E. of the Dealer Agreement, Ditch Witch was obligated to "promptly and efficiently render warranty service to the owners" of Bandit's products. (Doc. No. 59-1, p. 8). Under Paragraph 8.G. of the Dealer Agreement, Ditch Witch must "indemnify BANDIT and the manufacturers of Products and hold them harmless from and against any and all liabilities that may be asserted or arise by reason of Dealer's failure, in whole or in part, to fulfill its duties pursuant to this Paragraph 8 of this Agreement." *Id.* In short, Bandit contends that one or more aftermarket cutter-body assemblies sold by the Plaintiff damaged a customer's equipment and that Ditch Witch failed to fulfill its obligation, under Paragraph 8 of the Dealer Agreement, to fix that damage.

Ditch Witch points out that there is no dispute that any request was ever made of Ditch Witch to provide the warranty service at issue, and therefore there can be no claim for breach of contract based upon a failure to render warranty service. Nelco is the only customer that Bandit claims has suffered any damage as a result of any aftermarket cutter-body assembly sold by Ditch Witch. The testimony of Nelco's principal, Nelson, is that he contacted Bandit directly to inform Bandit of the alleged damage. He never contacted Ditch Witch about the problem. After contacting Bandit about the problem, he had no further contact with Ditch Witch. Although

Bandit did ship parts to Nelco in response to Nelco's contact, there is no dispute that Bandit made no attempt to inform Ditch Witch of any request for service or request that Ditch Witch provide any service to the Nelco equipment.

Bandit asserts that Nelson did not contact Ditch Witch about the problems it had with the cutter-bodies because Ditch Witch "was not kind to [Nelco] or not very helpful to" Nelco and thus a reasonable jury could find that Ditch Witch would not have provided the warranty service for Nelson even if he had contacted Ditch Witch. *See* Doc. No. 61-7, p. 20. Bandit's position is based upon pure speculation. Paragraph 8.E. of the Dealer Agreement cannot reasonably be interpreted to require Ditch Witch to render warranty service when it has not been contacted (by either Bandit or the customer) to do so. Since Ditch Witch had no obligation to "promptly and efficiently render warranty service" to a machine that it did not know needed any service, it likewise had no obligation to indemnify Bandit for failing to provide that service. Consequently, summary judgment is granted in favor of Ditch Witch as to Bandit's claim set forth in Paragraph 60(d) of the Counterclaim.[3]

### 3. Unfair and Deceptive Trade Practices

Bandit's Second Claim for Relief is for violation of the UDTPA. Bandit asserts that the bases for this claim include Ditch Witch's manufacture and sale of aftermarket cutter-bodies; the use of the www.banditofthesoutheast.com URL in connection with the marketing of Trelan products; certain alleged representations by Ditch Witch to Bandit regarding its plans for facilities and staffing; and allegedly courting a potential competing manufacturer of Bandit while actively seeking to hide that fact from Bandit.

---

[3] Ditch Witch also argues in support of its motion as to Paragraphs 60(b), (c), and (d) of Bandit's breach of contract claim that Paragraph 4G of the Dealer Agreement requires written notice and a 10 day cure period prior to default. The Court finds it unnecessary to reach this argument as the claims at issue fail for the reasons stated herein.

To state a claim for unfair and deceptive trade practices, Bandit must obviously show that Ditch Witch committed an unfair or deceptive act or practice. *See Dalton v. Camp*, 548 S.E.2d 704, 711 (N.C. 2001). A deceptive trade practice "is one that possesses the tendency or capacity to mislead, or creates the likelihood of deception." *Noble v. Hooters of Greenville (NC), LLC*, 681 S.E.2d 448, 452, (N.C. Ct. App. 2009). "A practice is unfair when it offends established public policy as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." *Marshall v. Miller*, 276 S.E.2d 397, 403 (N.C. 1981). Whether an act or practice is unfair or deceptive under the UDTPA is a question of law for the court. *RD & J Props. v. Lauralea-Dilton Enters., LLC*, 600 S.E.2d 492, 500-501 (N.C. Ct. App. 2004).

In order to establish an UDTPA claim, the Defendant must show "[s]ome type of *egregious or aggravating* circumstances." *Phelps Staffing, LLC v. C.T. Phelps, Inc*., 740 S.E.2d 923, 928 (N.C. Ct. App. 2013) [emphasis in original]. Moreover, "a mere breach of contract, even if intentional, is not sufficiently unfair or deceptive to sustain an action under N.C.G.S. § 75–1.1." *Eastover Ridge, L.L.C. v. Metric Constructors, Inc.*, 533 S.E.2d 827, 832-33 (N.C. Ct. App. 2000); *Jones v. Harrelson & Smith Contr'rs, LLC*, 670 S.E.2d 242, 259 (N.C. Ct. App. 2008) ("North Carolina courts are extremely hesitant to allow plaintiffs to attempt to manufacture a tort action and alleged UDTP out of facts that are properly alleged as breach of contract claim."). As the Fourth Circuit has observed,

> conduct carried out pursuant to contractual relations rarely violates the UTPA. In fact, even an intentional breach of contract is normally insufficient to contravene the UTPA; a breach of contract must be particularly egregious to permit recovery under North Carolina's UTPA.

*South Atlantic Ltd. Partnership of Tennessee, L.P. v. Riese*, 284 F.3d 518, 536 (4th Cir. 2002) (citing *Canady v. Crestar Mortgage Corp.*, 109 F.3d 969, 975 (4th Cir. 1997)).

The Court finds as a matter of law that none of Bandit's stated bases for its UDTPA claim rise to the level of "egregious or aggravating circumstances." In fact, it appears that Bandit is attempting to manufacture an UDTPA claim out of a breach of contract claim. Accordingly, Bandit's UDTPA claim must fail.

IT IS THEREFORE ORDERED that the parties' Motions for Partial Summary Judgment (Doc. Nos. 51 and 57) are hereby GRANTED.

Signed: January 27, 2017

Graham C. Mullen
United States District Judge